# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re ) | Chapter 7 |
| ) | |
| LANCELOT INVESTORS FUND, L.P., ) | Case No. 08-28225 |
| ) | |
| Debtor. ) | Hon. Jacqueline Cox |
| ) | |
| In re ) | Chapter 7 |
| ) | |
| LANCELOT INVESTORS FUND, ) | Case No. 08-28226 |
| II, L.P., ) | |
| ) | Hon. Jacqueline Cox |
| Debtor. ) | |
| ) | |
| RHONE HOLDINGS II, LTD., et al., ) | |
| ) | |
| Appellants, ) | |
| ) | Case Nos. 15 C 1720 & 15 C 1730 |
| v. ) | |
| ) | Judge Jorge L. Alonso |
| RONALD R. PETERSON, ) | |
| ) | |
| Appellee, ) | |

## MEMORANDUM OPINION AND ORDER

Appellants Ritchie Capital Structure Arbitrage Trading, Ltd., Yorkville Investment I, L.L.C., Rhone Holdings II, Ltd., and Ritchie Special Credit Investments, Ltd. appeal Bankruptcy Judge Cox's disallowance of their claims against debtors Lancelot Investors Fund L.P., Lancelot Investors Fund II, L.P., and Lancelot Investors Fund, Ltd. For the reasons set forth below, the Court affirms the bankruptcy court's decision.

**Facts**

The debtors were investment funds managed by Lancelot Investment Management, LLC, an entity owned and controlled by Gregory Bell. (Claim 160-2 ¶ 2.)[1] The debtors' primary activity was making loans to companies owned and controlled by Thomas J. Petters, which were purportedly involved in the "diverting" business, *i.e.*, buying goods at liquidation and diverting them to another market. (*Id.* ¶ 3.) Petters told the debtors that he had relationships with vendors from whom he could obtain consumer electronics cheaply and then resell them to "big box" stores at a profit. (*Id.*) Petters said he would use loans from the debtors to buy the products and repay the loans after the products were resold. (*Id.*) In fact, however, Petters' diverting business was a Ponzi scheme. (*Id.* ¶ 4.)

In December 2007, Petters told Bell that he could not make the payments on the promissory notes to debtors. (*Id.* ¶ 6.) Bell, whose companies were entirely dependent on the viability of Petters' business, agreed to an extended repayment term. (*Id.*)

In January 2008, Petters told Bell that he could not pay the notes, even with the extension. (*Id.* ¶ 7.)

On January 31, 2008, a broker working on Petters' behalf contacted Thane Ritchie, founder and CEO of RCM, appellants' investment manager, seeking financing for Polaroid, another company owned by Petters. (*Id.* ¶¶ 11, 44.) Petters told Ritchie that Polaroid needed a bridge loan because its loan facility with JP Morgan was about to expire and Polaroid had not yet found new, permanent financing. (*Id.* ¶ 11.) Petters did not tell Ritchie that he intended to use at least some of the Polaroid funds for his fraudulent diverting business. (*Id.*)

---

[1] Because the eight claims at issue are identical, the Court will cite only to Claim 160-2.

On February 1, 2008, Ritchie called Bell and asked whether "Bell had any objection to Ritchie speaking directly to Petters," and "Bell indicated that he had no objection." (*Id.* ¶ 13.) The same day, Ritchie Special Credit Investments, Inc. loaned Polaroid's parent company, Petters Group Worldwide, LLC ("PGW"), $31 million pursuant to a promissory note that Petters personally guaranteed and said he would secure with Polaroid stock "as soon as reasonably possible." (*Id.* ¶¶ 12-13, 45, 49.) Subsequently, appellants made $158 million in "Polaroid" loans to PGW in return for short-term promissory notes and Petters' guarantees, as follows: (1) on February 4, 2008, Ritchie Special Credit Investments, Inc. made two loans in the total amount of $40 million, and Rhone Holdings II, Ltd. made a $16 million loan; (2) on February 5, 2008, Yorkville Investment I, L.L.C. made a $13 million loan; (3) on February 7, 2008, Ritchie Special Credit Investments, Inc. made a $4 million loan and Rhone Holdings II, Ltd. made a $12 million loan; (4) on February 15, 2008, Rhone Holdings II, Ltd. made a $5 million loan; (5) on February 19, 2008, Ritchie Special Credit Investments, Inc. made a $9 million loan and Rhone Holdings II, Ltd. made a $16 million loan; and (6) on May 9, 2008, Yorkville Investment I, L.L.C. made a $4 million loan and Ritchie Capital Structure Arbitrage Trading, Ltd. made a $8 million loan. (*Id.* ¶ 49.) In addition to the "Polaroid" loans, on March 2008, appellants also gave another Petters entity, Petters Company, Inc., two loans in the aggregate amount of $31 million purportedly for a diverting transaction involving PlayStation video game consoles. (*Id.* ¶ 51.)

Instead of using appellants' funds for Polaroid's operations or to buy PlayStation consoles for a diverting transaction, Petters used the money for his fraudulent diverting business, $37 million of which ended up in the Debtors' hands. (*Id.* ¶ 53.)

On February 26, 2008, Petters proposed to Bell that they engage in "round-trip" transactions; that is, that debtors send money to Petters, who would treat the money as an investment in a new diverting transaction and issue a new promissory note, and Petters would then transfer the money back to the debtors, which would record the transfer as payment on a previous promissory note. (*Id.*) Between February 26, 2008 and September 2008, debtors and the Petters companies engaged in more than eighty-six round-trip transactions. (*Id.* ¶¶ 7, 9.)

On December 1, 2008, Petters was indicted on twenty counts that included conspiring to and committing wire and mail fraud and money laundering, and ultimately convicted on all twenty counts. (*Id.* ¶¶ 63-64.) In 2009, Bell pleaded guilty to wire fraud in connection with the round-trip transactions. (*Id.* ¶ 66.)

Appellants filed claims in the bankruptcy court to recover the $37 million they loaned to the Petters entities that ended up in the debtors' hands. They alleged that the debtors were liable for fraudulently concealing material information about Petters, aiding and abetting Petters' fraud, conspiring with Petters to commit fraud, and unjust enrichment. The bankruptcy court disallowed the claims under Federal Rule Civil Procedure 12(b)(6) as failing to state plausible claims for relief. This appeal followed.

## Discussion

"In an appeal from a bankruptcy court's decision, . . . the bankruptcy court's findings of fact are upheld unless clearly erroneous and the legal conclusions are reviewed *de novo*." *In re A-1 Paving & Contracting, Inc.*, 116 F.3d 242, 243 (7th Cir. 1997). Because the bankruptcy court disallowed the claim under Rule 12(b)(6), the Court reviews that decision de novo. *Fuqua v. SVOX*

*AG*, 754 F.3d 397, 400 (7th Cir. 2014). On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations" but must contain "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In Count I of their claims, appellants assert that debtors are liable for fraudulent concealment. To state a viable claim, appellants must allege, among other things, that debtors "concealed a material fact" that they had "a duty to disclose" to appellants. *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 969 (Ill. App. Ct. 2004). Appellants admit that they did not invest in debtors (*see* Claim 160-2 ¶ 6 n.1), and allege no facts from which a duty to disclose may otherwise be inferred. Thus, the bankruptcy court correctly concluded that appellants do not state a claim for fraudulent concealment.

In Counts II and III of the their claims, appellants allege that debtors are liable for aiding and abetting Petters' fraud and for conspiracy, respectively. "A claim for aiding and abetting requires the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Time Savers, Inc. v. LaSalle Bank, N.A.*, 863 N.E.2d 1156, 1168 (Ill. App. Ct. 2007) (quotations omitted). "'The elements of civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of

which one of the conspirators committed an overt tortious or unlawful act.'" *Id.* at 1167 (quoting *Fritz v. Johnston*, 807 N.E.2d 461 (Ill. 2004)). The Trustee contends, and the bankruptcy court held, that appellants did not satisfy the substantial assistance or combination elements of these claims.

Appellants argue that these elements can be inferred from their allegations that: (1) in January 2008, Petters proposed to Bell that they engage in "round-trip" transactions; (2) Bell's agreement to engage in such transactions "reveals that [he] knew that Petter's diverting operation was not legitimate"; and (3) on February 1, 2008, pursuant to agreements between RCM and Lancelot Investment Management that barred Ritchie from dealing directly with Petters, Bell told Ritchie he could contact Petters directly but did not tell Ritchie about Petters' fraud.[2] (*See* Claim 160-2 ¶¶ 7-8, 13.) Appellants contend that these allegations support the inference that Bell knew Petters was operating a Ponzi scheme and agreed to participate in and/or substantially assisted Petters with that scheme.

The Court disagrees. First, appellants' allegation that Petters proposed the "round-trips" in January 2008 is contradicted by the exhibits they attached to their claim, which "take[] precedence" over their allegations. *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013); (*see* Claim 160-2, Ex. F, Plea Agreement at 1, *United States v. Bell*, No. 09-273 (D. Minn.) (stating that Bell "created, devised, [and] executed" the "round-trip" scheme "between on or about February 26, 2008 and September 24, 2008"). Thus, there is no basis for inferring that Petters had approached Bell about the "round-trip" plan on February 1, 2008, when Bell told Ritchie he could speak directly to Petters. Second, even if Bell had known about the round trips on February 1, that fact would

---

[2]Appellants argue that Bell gave his "consent for Ritchie to loan to Petters directly" (Appellants' Br. at 13), but they allege only that Ritchie consented to Bell "speaking directly to Petters." (*See* Claim 160-2 ¶ 13.)

suggest that Bell knew Petters was in financial trouble, but not that he knew Petters' whole operation was a Ponzi scheme. Third, even if there were a basis for inferring that, on February 1, Bell knew about Petters' fraud, the simple fact that Bell did not object Ritchie speaking directly to Petters still would not support the inference that Bell encouraged, urged or otherwise induced appellants to loan money to Petters. (*See* 12/11/14 Hr'g Tr. at 8 (appellants' counsel admitting that the only thing Bell told Ritchie was, "sure, you can talk to [Petters]"; 1/20/15 Hr'g Tr. at 4, APP01473 (appellants' counsel admitting that "[Bell] didn't object to [Ritchie] talking to [Petters], as opposed to saying something like this loan is a very good idea, encouraging Ritchie to make the loan, or saying that these specific terms were what [Bell] was consenting to").) In short, the bankruptcy court did not err in concluding that appellants did not state a claim for aiding and abetting or conspiracy.

Appellant's last claim is that debtors were unjustly enriched by the loans appellants made to Petters. "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). However, as the Seventh Circuit noted in *Cleary v. Philip Morris, Inc.*, the status of unjust enrichment in Illinois is not entirely clear:

> The Illinois Supreme Court appears to recognize unjust enrichment as an independent cause of action. [*See*] *Raintree Homes, Inc. v. Vill. of Long Grove*, 209 Ill. 2d 248, 282 Ill. Dec. 815, 807 N.E.2d 439, 445 (2004). . . .
>
> In contrast . . . , there is a recent Illinois appellate court [case] that suggests the opposite, namely, that an unjust enrichment claim cannot stand untethered from an underlying claim. *See Martis v. Grinnell Mut. Reinsurance Co.*, 388 Ill. App. 3d 1017, 329 Ill. Dec. 82, 905 N.E.2d 920 (2009). . . . Without setting out a comprehensive treatise on Illinois unjust enrichment law in an attempt to resolve the

7

apparently conflicting language of the *Raintree Homes* and *Martis* cases, we suggest one way to make sense of it. Unjust enrichment is a common-law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment, and this retention is unjust. What makes the retention of the benefit unjust is often due to some improper conduct by the defendant. And usually this improper conduct will form the basis of another claim against the defendant in tort, contract, or statute. So, if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim – and, of course, unjust enrichment will stand or fall with the related claim. . . .

656 F.3d 511, 516-17 (7th Cir. 2011) (footnote omitted). In this case, the unjust enrichment claim is tied to the fraudulent inducement claim, and thus, as the bankruptcy court held, falls with it.

## Conclusion

For the reasons set forth above, the Court affirms the bankruptcy court's decision disallowing appellants' claims. These cases are terminated.

**SO ORDERED.**            **ENTERED:  May 28, 2015**

**HON.  JORGE L. ALONSO**
**United States District Judge**